[No. 10730.  Department One.  April 21, 1913.]

ELIZABETH ROSS, *Respondent*, v. KENWOOD INVESTMENT
COMPANY *et al., Appellants.*[1]

ATTORNEY IN FACT—POWERS OF AGENT—NOTICE.  The apparent
authority of an attorney in fact, acting under a recorded power of
attorney, is his real authority, so far as concerns persons dealing
with him without actual knowledge of any limitation on his powers.

VENDOR AND PURCHASER—BONA FIDE PURCHASERS—CONSIDERATION.
Where a sufficient consideration is expressed upon the face of a quit-
claim deed executed by an attorney in fact, a subsequent purchaser
of the property may rely thereon, where there was nothing in the
records to induce an ordinarily prudent person to suspect that any
of the recitals in the deed indicated fraud or want of a fair con-
sideration.

PRINCIPAL AND AGENT — AUTHORITY — POWER OF ATTORNEY—CON-
STRUCTION.  A general power of attorney to purchase, receive, take,
bargain, sell, and convey lands, authorizes the attorney to exchange
lands, especially where the land was dealt with as having a fixed and
agreed value.

SAME.  The rule of strict construction of powers of attorney can-
not be allowed to defeat the evident intent of the principal.

SAME—EXTENT OF AUTHORITY.  The authority of an attorney in
fact having the absolute power of disposition, is not lessened by
provisions in a contract executed by the attorney reserving con-
tingent rights in the principal, and such a contract does not pre-
vent the attorney from afterwards making an absolute conveyance of
such contingent rights.

Cross-appeals from a judgment of the superior court for
King county, Albertson, J., entered May 27, 1912, upon find-
ings in favor of the plaintiff, in an action to quiet title.  Re-
versed.

*Palmer & Askren* (*A. J. Falknor*, of counsel), for appel-
lants Kenwood Investment Company *et al.*

*Brady & Rummens*, for appellant Allen.

*John S. Jurey*, for respondent Ross.

PARKER, J.—The plaintiff, claiming to be the owner of lots
1 and 2, of block 54, division 6, Capitol Hill addition to Se-

[1]Reported in 131 Pac. 649.

attle, seeks to have certain instruments of record in the auditor's office of King county canceled, as clouds upon her title, and have her title quieted as against the claims of the defendants. At the conclusion of a trial upon the merits, the court rendered a decree canceling the instruments complained of by the plaintiff and quieting her title as against the claims of the defendants; but awarding to certain of the defendants liens upon the lots for money expended by them in satisfaction of the tax and other liens thereon. The defendants, claiming title to the lots under certain of the instruments canceled by the decree, and also the defendant Elizabeth Allen, claiming a lien upon the lots under a mortgage canceled by the decree, have appealed.

The rights of appellants rest upon certain deeds of conveyance in their chain of title which were executed by an attorney-in-fact of respondent. The extent of the power of the attorney-in-fact, as appellants were entitled to view such power, is the main problem for our solution. Counsel for respondent states, in the introduction of his able and voluminous brief, that, "The case is a long, complex and intricate one, both as to the facts and the law involved." Were we dealing with the rights of respondent as against her attorney-in-fact, and her immediate grantee named in the deed executed by her attorney-in-fact, the controversy might well be regarded as being very complex and intricate. But since appellants are not the immediate grantees of respondent and were entire strangers to her at all times prior to acquiring their respective interests in the lots under subsequent conveyances, we think it will appear, as we proceed, that the controlling facts are not seriously involved, nor are they subject to serious controversy.

The lots involved are now, and have been at all times, unoccupied and not in the physical possession of any one. During a period of some eight years prior to October, 1911, respondent spent most of her time in Alaska, being there all of the time from June, 1907, to October, 1911. During the

larger part of this period, she was in remote and somewhat inaccessible places in Alaska, so far as communication with her friends at Seattle was concerned. She evidently went to Alaska expecting to be so situated, and the last time she left Seattle for Alaska in June, 1907, she now admits that she then expected to remain a number of years. While her power of attorney here involved had been executed prior to that time, she then had a conversation with her attorney-in-fact in Seattle, resulting in the understanding between them that the power of attorney should remain in force during her absence. It reads as follows:

"Know all men by these presents: That I, Elizabeth Ross, of Council City, Council Precinct, Second Division, District of Alaska, have made, constituted and appointed, and by these presents do make, constitute and appoint Hattie Boyker, of the city of Seattle, county of King, in the state of Washington, my true and lawful attorney for me and in my name, place and stead and for my use and benefit to ask, demand, sue for, recover, collect and receive all such sums of money, debts, dues, accounts, legacies, bequests, interests, dividends, annuities and demands whatsoever, as are now or shall hereafter become due, owing, payable or belonging to me, and have, use, and take all lawful ways and means in my name or otherwise, for the recovery thereof, by attachments, arrest, distress or otherwise, and to compromise and agree for the same, and to make, sign, seal and deliver acquittances, or other sufficient discharges for the same, for me and in my name, to bargain, contract, agree for purchase, receive and take lands, tenements, hereditaments, and accept the seizin and possession of all lands, and all deeds, and other assurances in the law therefor; and to lease, let, demise, bargain, sell, remise, release, convey, mortgage and hypothecate lands, tenements and hereditaments, upon such terms and conditions and under such covenants as she shall think fit. Also to bargain and agree for, buy, sell, mortgage, hypothecate, and in any and every way and manner deal in and with goods, wares and merchandise, choses in action and other property, in possession or in action, and to release mortgages on lands or chattels, and to make, do and transact all and every kind of business of what nature and kind soever. And also for me

and in my name, and as my act and deed, to sign, seal, execute, deliver and acknowledge such deeds, leases and assignments of leases, covenants, indentures, agreements, mortgages, hypothecations, bottomries, charter parties, bills of lading, bills, bonds, notes, receipts, evidences of debt, releases and satisfaction of mortgage judgment and other debts, and such other instruments in writing, of whatever kind or nature, as may be necessary or proper in the premises:

"Giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes as I might or could do if personally present, I, Elizabeth Ross, hereby ratifying and confirming all that my said attorney Hattie Boyker shall lawfully do or cause to be done, by virtue of these presents.

"In witness whereof I have hereunto set my hand and seal the 16th day of August in the year of our Lord one thousand nine hundred and four."

This power of attorney was duly signed and acknowledged by her before a notary public at Council City, in Alaska, and was thereafter duly recorded in the office of the auditor of King county. At that time respondent had acquired some real property in Seattle, and thereafter, in 1906, she acquired the lots here involved. In April, 1907, Hattie Boyker, as attorney-in-fact for respondent, executed a mortgage upon these lots to one Shorratt, to secure the sum of $1,238. This mortgage was duly recorded in the office of the auditor of King county, on May 13, 1907. This exercise of the power by Hattie Boyker as attorney-in-fact became known to appellants upon their examination of the abstract of title, preliminary to acquiring their respective interests in the lots, and there was nothing on record suggesting to appellants that the power had not been lawfully exercised. Indeed, respondent concedes that it was so lawfully exercised and within the scope of the power given. This was a circumstance suggesting to appellants that the power was being exercised, and that, so far as shown by the public records, it was unquestioned by

respondent up to the time appellants acquired their interest in the lots. On April 10, 1909, Hattie Boyker, as attorney-in-fact for respondent, executed a warranty deed, absolute in form, for these lots to the defendant Samuel C. Freels, reciting a consideration of "Fifty-five hundred dollars lawful money of the United States." Two days later, on April 12, 1909, defendant Freels executed a mortgage upon the lots to Elizabeth Allen, to secure an indebtedness of $2,000 evidenced by his promissory note to her. This deed and mortgage were recorded in the auditor's office of King county on April 26, 1909, at 11:42 a. m. and 11:43 a. m. respectively. Thereafter Freels caused the Shorratt mortgage to be paid and satisfied of record.

On October 22, 1909, Freels entered into a contract for the sale of the lots to appellant John L. Yocum, for the sum of $5,500, receiving $200 cash payment thereon and signing an earnest money receipt accordingly; the agreement being that the sale should be completed within thirty days. Yocum was acting for himself and appellants other than Elizabeth Allen. The abstract of title to the lots being examined by attorneys for the prospective purchasers, and the sale being about to be completed, John H. Allen, an attorney of Seattle, notified Yocum by letter that there existed a contract between Freels and respondent, by her attorney-in-fact, relating to the purpose of the execution of the deed conveying the lots to Freels; that the contract had been filed in the office of the auditor of King county, and that respondent would have "until the first day of August, 1910, in which to redeem said property." This was the first notice Yocum and his associates received of the existence of this contract, and upon an examination of the records in the auditor's office thereafter caused to be made by them, they first learned of its contents. It had been recorded at the request of J. H. Allen on November 23, 1909. This contract was drawn at the same time the deed was given by respondent by her attorney-in-fact to Freels, on April 10, 1909, and was evidently intended by all

parties to be then executed. The evidence indicates that it was then actually signed by the parties, though upon its face it appears to have been formally executed and acknowledged on October 20, 1909. Its language is somewhat involved; but it evidences an intent on the part of Freels and respondent's attorney-in-fact to have the lots conveyed to Freels in consideration of the conveyance to respondent of certain other real property and the assumption by Freels of incumbrances, including taxes and local assessments, amounting to a considerable sum then against the lots, all in lieu of the $5,500 money consideration expressed in the deed to Freels. The contract also refers to the $2,000 mortgage given by Freels to Elizabeth Allen in such manner as to evidence an understanding that Freels should execute such mortgage immediately upon receiving the conveyance for the lots. The contract also evidences an intention to have Freels take title to the lots, subject to redemption or repurchase by respondent, by her deeding back the other real property received by her in part consideration therefor and paying certain sums to Freels, and also makes provision for taking care of the Allen mortgage. The following provisions of the contract relate to these matters:

"It is understood and agreed that should Elizabeth Ross disapprove of said sale of said lots, then, in that event, the said Elizabeth Ross, either in person or by her said attorney-in-fact, should be entitled to re-possess herself of the title to said lots.   .   .   .

"It is further understood and agreed between the parties hereto that all of the papers together with the abstract, receipt and this contract shall be deposited in escrow and remain with the said J. H. Allen, until this contract shall terminate as herein provided.   .   .   .

"It is further distinctly understood and agreed, between the parties hereto, that the said Elizabeth Ross shall have until the first day of August next, ensuing, to redeem said property as herein provided;   .   .   .

"Should the said Elizabeth Ross fail to redeem said property as herein provided, then said Allen shall deliver deeds,

etc., to the said property on Capitol Hill shall be and remain the property of the said Freels."

While the contract seems to contemplate the leaving of the papers in escrow in the hands of J. H. Allen, we think the evidence shows that the deed to Freels and the mortgage to Elizabeth Allen were intended to be then recorded, and were in fact recorded by consent of all of the parties on April 26, 1909. Appellant Yocum and his associates, thus learning of this contract giving respondent the right to repossess herself of the title to the lots under the conditions therein specified, insisted on Freels' procuring a release of such right on the part of respondent before completing the purchase. To satisfy this requirement of Yocum and his associates, Freels procured a quitclaim deed from respondent, executed by her attorney-in-fact, releasing her right to redeem the lots, reciting as a consideration therefor: "The sum of five dollars and other good and valuable considerations," and further reciting as follows:

"This deed is made to convey the title to property aforesaid, free from any equities or contingent rights that may exist therein, in favor of the party of the first part by reason of a certain instrument dated October 20th, 1909, and recorded November 23rd, 1909, File No. 650860, Vol. 683, Page 473 of Deeds, in the office of the auditor of King county, Washington, executed by the said Elizabeth Ross by her attorney-in-fact, Hattie Boyker, and Samuel C. Freels, the said instrument being by inadvertence dated the 20th day of October, 1909, but it should have borne date the 12th day of April, 1909, and the said month of August therein referred to as 'The first day of August next ensuing, was the month of August, 1909.' "

. Thereafter, on January 12, 1910, the sale to Yocum and his associates was completed by Freels executing a deed to appellant Lewis C. Troughton, who thereafter conveyed the lots to appellant Kenwood Investment Company. This company is a corporation. Its entire stock is owned by Yocum, Troughton and E. B. Palmer, who have entire control of its

interests. These constitute the associates of Yocum in whose interest he acted in making the contract of purchase with Freels. Therefore, so far as notice of respondent's equities is concerned, we may regard all of these as standing in the same position. The consideration of $5,500, specified in the contract of purchase and deed from Freels to Troughton, executed in pursuance thereof, was the actual amount of the consideration paid by Yocum and his associates, including the assumption by them of the $2,000 Allen mortgage and some local assessments then against the lots. It is conceded that neither Yocum nor any of his associates were acquainted with the respondent or her attorney-in-fact, Hattie Boyker, until after the closing of their deal with Freels and the entire consummation of their purchase of the lots from him; and a careful reading of this entire record fails to disclose any fact pointing to any knowledge on the part of Yocum or any of his associates touching respondent's interests in the lots, or the authority possessed by her attorney-in-fact, or the nature of Freels' dealings with respondent and her attorney-in-fact, other than that disclosed by the recorded instruments we have noticed. It is conceded that the power of attorney was not revoked until long after appellants had acquired their interest in the lots. While there appears a vast array of facts in this voluminous record which would have some bearing upon the question of respondent's right to relief as against Freels and her attorney-in-fact, we think the foregoing is a fair statement of all facts which can have any relation whatever to the rights of respondent as against either of these appellants, and this is all we are here concerned with.

Counsel for respondent rests her right to the relief prayed for as against appellants, upon the theory that the power of attorney did not vest in Hattie Boyker, as her attorney-in-fact, the power to convey the lots in the manner here shown; that both deeds executed by Hattie Boyker as attorney-in-fact for respondent were in fraud of respondent's rights, and that appellants had such knowledge thereof as to render

those deeds void and ineffectual, as to them, furnishing no
support to their present claim of title in the Kenwood In-
vestment Company. Looking to the terms of the power of
attorney alone, it would seem difficult indeed to frame a
granted power to acquire and convey real property by an
attorney-in-fact in more comprehensive language, not only
as to the mere power to acquire and convey, but also as to
the discretion vested in the attorney-in-fact to determine the
conditions and purposes of such contemplated acquisition and
conveyance, and when such acquisition and conveyance should
be made. The language of the power of attorney evidencing
these powers is:

"For me and in my name, to bargain, contract, agree for,
purchase, receive and take lands, . . . and to lease, let,
demise, bargain, sell, remise, release, convey, mortgage, and
hypothecate lands, . . . And also for me and in my
name, and as my act and deed, to sign, seal, execute, deliver
and acknowledge such deeds, leases and assignments of leases,
covenants, indentures, agreements, . . . and such other
instruments in writing, of whatever kind or nature, as may
be necessary or proper in the premises."

These are the powers which appellants were advised by
the record that Hattie Boyker possessed as attorney-in-fact
for respondent when she executed the deeds to Freels for the
lots, and appellants are chargeable with no other knowledge
relative thereto, unless, at the time of acquiring their respect-
ive interests in the lots, they had notice of some facts sug-
gesting inquiry upon their part that Hattie Boyker did not
possess all of the powers evidenced by this language, or that
the power had been exercised in fraud of respondent's rights.
Her apparent authority thus evidenced to appellants was in
law her real authority so far as their rights are concerned.
31 Cyc. 1331; Mechem, Agency, § 289.

Counsel for respondent seems to rest his contentions prin-
cipally upon the facts and circumstances attending the exe-
cution of the first deed from respondent by her attorney-in-
fact to Freels, which he argues was an unwarranted exer-

cise of power on the part of Hattie Boyker as attorney-in-fact, in that that transaction was an exchange and not a sale of respondent's lots, and that it was attended by fraud on the part of Freels, working to the injury of respondent. We have seen that the only notice appellants ever had of the nature or purpose of that conveyance, aside from the recitals of the first deed, is that contained in the recorded contract between Freels and respondent, and the quitclaim deed, both executed by respondent by her attorney-in-fact. It is true that that contract informed appellant that respondent had a right to redeem or repurchase the lots, and if that deed be viewed as a mortgage only, she would probably have such right even beyond the time fixed for the redemption or repurchase, and until Freels foreclosed such right by appropriate proceedings in court. Viewing that deed as an absolute conveyance and respondent's rights as being only a right to purchase back the lots within the time agreed upon, it might well be argued that her right to so purchase back the lots expired before appellant Yocum and his associates acquired their interest in the lots. The recitals in the quitclaim deed from respondent to Freels by her attorney-in-fact clearly state facts so indicating. Appellants' rights do rest alone upon the first deed, however that may be. Respondent, on December 1, 1909, by her attorney-in-fact, executed this quitclaim deed to Freels for the lots, reciting both a money and valuable consideration therein, and additional facts showing that it was the very purpose to thereby convey all of the interest of respondent in the lots and especially to free the lots from any equities or contingent rights which might then be existing in respondent by virtue of the contract accompanying the first deed.

Did Hattie Boyker, as attorney-in-fact for respondent, have power to execute this quitclaim deed? The only argument advanced to the contrary is that it was without consideration and was a part of the fraud practiced by Freels in acquiring title to the lots from respondent. It was not

without sufficient consideration expressed upon its face, and that is all that appellants were required to notice so far as the consideration was concerned. They were informed, by the first deed and the terms of the contract, that respondent had some contingent interest in the lots. They were further informed, by the recitals in the quitclaim deed, that that contingent interest had then expired by limitation; and we think no facts are shown in this record that would induce an ordinarily prudent person in the position of appellants to suspect that any of these recitals in the deed or the contract indicated a want of fair consideration moving to respondent or fraud upon the part of Freels or Hattie Boyker, respondent's attorney-in-fact, in the ultimate transfer of the absolute title to Freels by the quitclaim deed. In *Kinney v. McCall*, 57 Wash. 545, 107 Pac. 385, Justice Rudkin, speaking for the court, said:

"A person who purchases property for a nominal or grossly inadequate consideration is not a bona fide purchaser, and one who purchases from such a purchaser with notice stands in his shoes; but a purchaser of real property is not bound to compare the consideration recited in every deed in his chain of title with the market value of the property at the time of the several conveyances, under penalty of having the property impressed with a secret trust in his hands. If such a rule were sanctioned by the courts, no person could safely purchase, hold or deal in lands."

This is indeed a just and wholesome doctrine for practical application in this new and growing state, where real property has become the subject of barter, exchange and sale, to an extent, it seems safe to say, which is equaled by comparatively few localities in the world.

Some contention is made upon the theory that the acquiring of title to the lots by Freels through these deeds was, in effect, an exchange and not a sale by the attorney-in-fact. This contention is rested upon the general rule that the power to sell and convey does not mean power to sell or convey except for a fair money consideration. Recurring to the

power of attorney, we find that Hattie Boyker as attorney-in-fact was was thereby given the power "to bargain, contract, agree for, purchase, receive and take lands," as well as to "bargain, sell, remise, release, convey, mortgage and hypothecate lands." In view of this language, we are of the opinion that the execution of the conveyances to Freels was a valid exercise of the power of Hattie Boyker as attorney-in-fact, even though the transaction may have been an exchange. It is worthy of note in this connection, that, while the transaction may in a sense be considered an exchange, the real property involved was dealt with therein as having a fixed and agreed value. Under such circumstances a transaction of this nature has generally been regarded in law as a sale rather than a mere exchange. 11 Am. & Eng. Ency. Law (2d ed.), 570.

Counsel invoke the general rule of strict construction of the language of powers of attorney to convey real property. While we recognize such to be the general rule, it should not be permitted to defeat the evident intent of the principal. In the case of *Posner Brothers v. Bayless*, 59 Md. 56, involving a granted power to mortgage, the court said:

"It is contended on the part of the appellants, that all powers of attorney must receive a strict interpretation, that the authority is never extended by intendment or construction beyond that which is given in terms, or is absolutely necessary for carrying the authority into effect, and hence the power in this case to borrow money and pledge the property therefor by way of mortgage, authorizes merely a strict formal mortgage, and sanctions no other form of security, and a pledge of no other description. But the rule that the authority conferred by a letter of attorney must be strictly pursued, cannot override the general and cardinal rule, that the intention of the party creating the power must prevail in its construction, and that such intention is to be ascertained from the language employed, and the object to be accomplished."

Some contention is made seemingly upon the theory that the reserved contingent rights of respondent, under the first

deed and contract accompanying it, lessened the power of the attorney-in-fact, in so far as her future dealings with that particular property is concerned. We are quite unable to follow counsel in this contention. The attorney-in-fact having the power of absolute disposition and conveyance of respondent's real property, we are unable to conceive of the lessening of that power by any language in the contract, an instrument executed by the attorney-in-fact herself. We are of the opinion that she still possessed all the power to convey the remaining contingent interest of respondent that she possessed before she conveyed subject to that interest. This was not a surrender of her power, but simply a withholding of the exercise of her entire power. Hence we think the quitclaim deed conveyed to Freels all of the remaining interest of respondent in the lots.

Some contention is made upon the theory of the inadequacy of the consideration passing from appellants in the acquiring of their interest in the lots. The only foundation for this is the fact that some of the witnesses, touching the question of value, testified that the lots were worth $7,000. It may be remarked that, upon the other hand, there were seemingly equally credible witnesses who testified that the lots were worth less than $5,500, the amount of the consideration which appellants actually gave therefor. Clearly this condition of affairs does not in the least impair appellants' rights.

Having arrived at the conclusion that appellant Troughton and his associates acquired good title to the lots, through the deeds to Freels from respondent by her attorney-in-fact, especially through the quitclaim deed, there need be but little said as to the rights of the mortgagee Elizabeth Allen. It necessarily follows that respondent is not in any position to resist the claims of Elizabeth Allen under her mortgage. Her claim, as against the land and as against Freels, who executed the note secured by her mortgage, may be the subject of future negotiations with, or litigation against, appellants and Freels,

but that is not a matter in which respondent has any interest.

We are of the opinion that the decree of the trial court must be reversed in so far as it decrees cancellation of the instruments involved and the quieting of title to the lots in respondent as against the rights of these appellants. It is so ordered, and the superior court is directed to enter a decree quieting the title of appellant Kenwood Investment Company to the lots, as prayed for in its answer, against all claims of respondent.

CROW, C. J., CHADWICK, GOSE, and MOUNT, JJ., concur.